*In re* MARRIAGE OF RANDALL S. BLANCHARD, Petitioner-Appellee, and JEANNIE K. BLANCHARD, Respondent-Appellant.

Fifth District   No. 5—86—0663

Opinion filed October 9, 1987.

Eric L. Terlizzi, of Pfaff, Garner & Terlizzi, of Salem, for appellant.

Scott Wilzbach, of Wilzbach & Elliott, of Salem, for appellee.

JUSTICE HARRISON delivered the opinion of the court:

Respondent, Jeannie K. Blanchard (now Jeannie K. Yount), appeals from a post-dissolution order of the circuit court of Marion County terminating her visitation rights. Respondent contends the court's determination that the visitation seriously disturbed the children's emotional health is against the manifest weight of the evidence. For the reasons which follow, we reverse and remand.

Respondent and petitioner, Randall S. Blanchard, were married on January 26, 1974. Three children were born to the marriage: Donna, born July 11, 1975; Samantha, born March 8, 1977; and Nicholas, born September 21, 1978. The family lived in Salem, Illinois. The marriage was dissolved by a judgment entered on December 6, 1979. This judgment incorporated an agreement of the parties that petitioner would receive custody of the three children with respondent to have "reasonable visitation." No time periods for visitation were set out in the judgment. On April 3, 1985, respondent filed a petition alleging petitioner had denied her reasonable visitation and requesting that the court schedule specific periods for visitation. Petitioner filed a counterpetition on May 10, 1985, requesting termination of all of respondent's visitation rights, alleging she had had almost no contact with the children since the dissolution. After a hearing on September 23, 1985, the court on October 3, 1985, ordered that respondent be granted visitation on alternate Sundays from 1 to 6 p.m. The court also stated in the order that it would review the situation in approximately six months. Another hearing was held on August 1, 1986. After this hearing, the trial court on September 2, 1986, terminated all

of respondent's visitation rights.

At the first hearing on September 23, 1985, respondent testified that four or five months after the judgment of dissolution, she moved to Florida with her parents, where she resided for approximately one year. Shortly after the dissolution, the children began living with petitioner's parents in Stone Mountain, Georgia, while petitioner attended engineering school as part of his employment with the Missouri Pacific Railroad. While respondent lived in Florida, she telephoned the children in Georgia once a month. She visited the children for one week in the summer of 1981. This visit came when respondent moved from Florida to Houston, Texas. Respondent testified that while in Houston, she did not have as much contact with the children as before because she did not have a telephone. The longest period during which she did not talk to them was four or five months. She testified she did not make trips to visit the children in Georgia because she was financially unable to do so. After living in Houston approximately one year, she returned to Florida. She again began telephoning the children once a month. In October of 1984, respondent moved to the St. Louis area, and shortly thereafter visited the children once at petitioner's home in Salem, Illinois. After that visit, she attempted to contact petitioner regarding visitation "a couple of times, and [she] got hung up on." She testified she also left messages for petitioner at his place of employment, but that he did not return her calls. She further stated that petitioner's new wife hung up on her "quite a few times." Respondent testified she has seen her children twice in the six years since the dissolution. On one occasion she had planned to visit them but became ill and had to cancel her plans to travel to Salem. Respondent remarried in March of 1985 and at the time of this hearing lived in Jennings, Missouri, a suburb of St. Louis.

Petitioner testified he had also remarried and that he resided in Salem. Petitioner confirmed that after his divorce from respondent, the children resided in Georgia with his parents while he attended engineering school. He visited the children five times a year, each visit lasting two weeks. Once the children were back living with him in Salem, there were times when respondent telephoned the children when they did not want to talk to her. On other occasions, petitioner refused to allow respondent to talk to the children when she called in the evening because the children were already in bed. He testified that respondent sometimes failed to send the children presents at Christmas and failed to send them cards or presents on their birthdays. Petitioner testified that the children were disappointed and hurt by respondent's failure to keep her promises to send gifts. Regarding

respondent's attempts to talk to him about visitation, petitioner admitted that respondent had attempted to contact him at his place of employment, but that these calls embarrassed him and he decided he was not going to talk to her. He also admitted that he refused respondent's request for visitation once when his new wife's mother was hospitalized. Also at this hearing, petitioner stated it was not his intention to deny respondent all visitation, but that visitation with restrictions would be acceptable to him. He further stated that the children have asked about their mother.

Petitioner's new wife, Kellen, testified that she did hang up on respondent on certain occasions because the children indicated they did not want to speak with her. These occasions were after respondent visited the children in October of 1984. Kellen also testified that there were occasions when respondent broke promises she had made to the children to visit them or send them gifts, and that on these occasions the children were "very disappointed."

After hearing this testimony, the trial court ordered that respondent be allowed visitation on alternate Sundays from 1 to 6 p.m., requiring the visitation to take place in the Salem area, and stated that it would review the matter of visitation in approximately six months.

A review hearing was held on August 1, 1986. At that time, respondent testified she then lived in Berkeley, Missouri, a suburb of St. Louis. She admitted she had missed 7 of the 21 possible visitation Sundays allowed her, but explained that on two occasions she was ill, and that on the other occasions she either could not afford to travel to Salem or did not have transportation. Respondent also testified that when she did visit the children, it was difficult to find places to go and things to do with them in Salem. Respondent further stated that she did not give the children presents on the previous Christmas because she and her new husband purchased a car.

Petitioner testified at this second hearing that when the Sunday visitation started in October of 1985, the children were afraid and asked if they had to go with their mother. He testified that on some occasions when respondent called to say she could not visit the children, the children acted relieved, but that on other occasions when respondent could not exercise visitation the children acted disappointed. Petitioner further testified that it was a "big disappointment" to the children when respondent failed to fulfill her promises to give them certain gifts. He also stated that in addition to failing to give the children Christmas presents, respondent had also failed to send two of the children presents on their birthdays. He testified that since the visitation began, Donna and Samantha have been struggling in school,

and that Samantha was required to repeat the third grade. He testified that Donna told him she wished "that all of this, that is this, this court and everything was over with" and that she could not concentrate on school. Petitioner testified that he feels the "ordeal" has upset the children and that the visitation "has hurt the kids more than helped."

The trial court also interviewed the three children in chambers with counsel present. The court asked Donna, age 11 at the time of the hearing, how the visitation had been going. Donna replied, "Not very good. She is not doing nothing [sic] with us." Donna told the court she did not want to go with her mother during the visitation periods, and explained that although her mother would take them swimming and roller skating, she would not personally participate but merely watched the children. Samantha, age nine at the time of this hearing, told the court she did not enjoy the visits with her mother, saying, "She doesn't play with us or anything." Samantha also told the court she did not look forward to the visits because she did not want to leave her baby brother, a child born to her father's second marriage. Nicholas, age seven, indicated he did not enjoy the visits, complaining that when the children asked their mother to play with them, she would say "No." The children stated that respondent's new husband, whom they called Mike, did play with them and they enjoyed his company.

After hearing this evidence, the trial court found "that the limited visitation that the mother has had with minor children of the parties since October 3, 1985, has had an adverse effect upon the children which has seriously disturbed their emotional state." The court then concluded that "it is in the best interest of the minor children of the parties that visitation with the Respondent be terminated." Respondent contends the court's findings are against the manifest weight of the evidence.

■■ ■ Section 607(a) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1985, ch. 40, par. 607(a)) in pertinent part provides: "A parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger seriously the child's physical, mental, moral or emotional health." Section 607(c) of the Act (Ill. Rev. Stat. 1985, ch. 40, par. 607(c)) provides: "The court may modify an order granting or denying visitation rights whenever modification would serve the best interest of the child; but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger seriously the child's physical, mental, moral or emotional

health." Section 607 states a strong public policy designed to preserve the relationship of parent and child (*Griffiths v. Griffiths* (1984), 127 Ill. App. 3d 126, 128, 468 N.E.2d 482, 484); therefore, the policy of this State is to grant liberal visitation rights. (*In re Marriage of Brophy* (1981), 96 Ill. App. 3d 1108, 1112, 421 N.E.2d 1308, 1311.) In matters of visitation, the primary concern of the court is the welfare of the child. The best interest of the child is normally fostered by having a healthy and close relationship with both parents. (96 Ill. App. 3d 1108, 1112, 421 N.E.2d 1308, 1311.) In *Frail v. Frail* (1977), 54 Ill. App. 3d 1013, 370 N.E.2d 303, the court stated:

> "Courts are reluctant to deny all visitation rights because of the underlying rationale that parents have a natural or inherent right of access to their children and that the sound public policy of this State encourages the maintenance of strong interfamily relationships, even in post-divorce situations. Only very extreme circumstances require and allow the trial court to permanently deprive a parent of visitation. [Citation.] However, the matter of visitation privileges rests in the broad discretion of the trial court. [Citation.]
>
> Although it is frequently pointed out by reviewing courts that a parent's right to child custody and visitation is not an absolute one, we should also recognize that there is always a strong possibility that the parent out of custody may at some later time acquire that responsibility, and to deny all visitation to the out-of-custody parent would effectively sever all ties between that parent and the child. A more difficult transition for the [child] in the future would be the result." (54 Ill. App. 3d 1013, 1015, 370 N.E.2d 303, 304-05.)

In order to restrict existing visitation rights under section 607(c), the burden is upon the custodial parent to prove that the current visitation endangers the welfare of the child. (*Woods v. Woods* (1986), 147 Ill. App. 3d 772, 774, 498 N.E.2d 906, 908.) The endangerment standard in the statute is an onerous one. *In re Marriage of Hanson* (1983), 112 Ill. App. 3d 564, 568, 445 N.E.2d 912, 915.

■■ We believe petitioner has failed to meet this onerous burden. It can be argued that the evidence presented by petitioner shows the children have been affected by the changes in their lives resulting from the divorce and its consequences. However, the evidence does not support a finding that the actual visitation with respondent seriously endangered the welfare of the children. Although the children told the court they did not enjoy the visits with their mother, their explanation was that even though she took them on outings to the

swimming pool and roller rink, she did not participate in the activities with them. While the children may have been disappointed at their mother's lack of participation, there was no testimony indicating that this lack of participation or the children's disappointment could seriously endanger their welfare. Petitioner also relies on evidence that respondent did not fulfill promises to give presents to the children, and that she failed to send Christmas presents or birthday gifts, and that the children were disappointed by this. Disappointment is an occasional aspect of every child's life, and there was no testimony that the absence of gifts or the broken promises seriously endangered the children's health.

Petitioner also presented evidence that respondent sometimes failed to exercise her rights to visit the children on alternate Sundays. Respondent, however, explained that when she was unable to come to Salem it was because she was ill or lacked the money or transportation necessary to make the trip. She further explained that it was difficult to find things to do or places to go in Salem, noting she had no home there to which to take the children. Petitioner also points to evidence that respondent did not attempt to regularly visit the children from the time of the divorce up until being granted the Sunday visitation. Respondent explained that she was financially unable to make the trip to Georgia when the children lived there with petitioner's parents. We further note that after the children moved back to Illinois, petitioner admitted that he refused to return calls from respondent, who was attempting to arrange visitation, and there was evidence petitioner's new wife hung up on respondent on certain occasions. Next, we acknowledge petitioner's testimony that Samantha and Donna were struggling in school since the Sunday visitations had begun, and that Samantha was required to repeat the third grade. However, petitioner presented no evidence of how the visitation for a few hours every other Sunday could be the cause of the children's difficulty at school or even if it had been the cause. Petitioner testified that Donna told him she wanted "this court and everything" to end. This indicates that the dispute between the parents was troubling her, but it does not show that the time spent with her mother was the cause of the problem.

We note that in *Frail v. Frail* (1977), 54 Ill. App. 3d 1013, 370 N.E.2d 303, the court preserved the visitation rights of a mother confined in a penitentiary for murdering her husband, and that in *In re Marriage of Neat* (1981), 101 Ill. App. 3d 1046, 428 N.E.2d 1093, the court preserved the visitation rights of a mother who had been arrested for disorderly conduct in the presence of her children and had

been physically restrained for her own protection while hospitalized for psychiatric treatment. These cases demonstrate the reluctance of courts of this State to terminate visitation rights.

In view of the public policy of this State of preserving the relationship of parent and child, and the policy disfavoring a denial of all visitation rights (*Frail v. Frail* (1977), 54 Ill. App. 3d 1013, 1015, 370 N.E.2d 303, 304), we must conclude petitioner has failed to meet his burden under section 607(c) of proving that the visitation with respondent would endanger seriously the children's physical, mental, moral or emotional health. We thus conclude the findings of the trial court are against the manifest weight of the evidence, and its termination of visitation rights constitutes an abuse of discretion. We reverse the order of the trial court and remand for a determination of reasonable visitation.

Reversed and remanded.

WELCH and LEWIS, JJ., concur.